In re BEVERAGES INTERNATIONAL LTD. d/b/a N.P. Beverages, Inc., Debtor.

In re N.P. BEVERAGES CORP. f/k/a Narragansett Sales of Southeastern Massachusetts, Inc.

CREDITORS' COMMITTEE AND TRUSTEES OF BEVERAGES INTERNATIONAL, LTD. CREDITORS' TRUST, Plaintiff,

v.

COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF REVENUE, Defendant.

Bankruptcy Nos. 84–895–JG, 84–01361–JG.
Adv. No. 87–1297–JNG.

United States Bankruptcy Court, D. Massachusetts.

Feb. 21, 1989.

Victor Bass, Palmer & Dodge, Boston, Mass., for plaintiff.

R. Alan Fryer, Peabody & Arnold, Boston, Mass., for defendant.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

The above captioned adversary proceeding has been pending before this Court since October 26, 1987. Following a pro-

longed period for discovery, the Creditors' Committee and the Trustees of Beverages International, Ltd. Creditors' Trust (collectively the "Trustees") moved for summary judgment with respect to their objection to the allowance of priority proofs of claim filed by the Commonwealth of Massachusetts, Department of Revenue (the "Commonwealth" or the "DOR"). The Commonwealth responded to the Trustees' motion by filing an opposition and its own motion for summary judgment. Through its motion, the Commonwealth seeks *inter alia* to establish the right of the United States Fire Insurance Company of America ("U.S. Fire") to be subrogated to the priority of the Commonwealth's claims. There being no material facts in dispute, the matter is ripe for summary judgment. *See* Bankruptcy Rule 7056 and Fed.R.Civ.P. 56.

### FACTS[1]

The Beverages International, Ltd ("Beverages") case was commenced by the filing of an involuntary petition under Chapter 11 on July 6, 1984. N.P. Beverages Corp. filed a voluntary petition under Chapter 11 on October 24, 1984. Beverages was in the liquor distribution business. In December 1982, it acquired Narragansett Sales, Inc. whose corporate name was changed to N.P. Beverages Corp. ("N.P."). On January 25, 1985, the Court entered an order confirming a consolidated liquidating plan for both debtors which provides for payment of the Commonwealth's priority tax claims with interest at the rate established by section 6621 of the Internal Revenue Code plus two and a half percent. Prior to confirmation, the Commonwealth filed four proofs of claim for unpaid excise taxes, totalling $185,249.07.

U.S. Fire issued two excise tax bonds in the names of Beverages and N.P. as principals for the benefit of the Commonwealth as obligee. Under the bonds, U.S. Fire was obligated to the Commonwealth for any unpaid liquor excise taxes not paid by the principals for the period from January 1, 1984 through July 7, 1984. Commencing in July of 1984, the Commonwealth made repeated demands for payment of the taxes, interest and penalties under the bonds. U.S. Fire and the Commonwealth entered into negotiations which culminated in the execution of a Settlement Agreement in April of 1985. Under the terms of the Settlement Agreement, U.S. Fire agreed to loan the Commonwealth the sum of $184,638.58.[2]

Furthermore, the Commonwealth authorized U.S. Fire to act as its agent in the prosecution of its claims against Beverages and N.P. In the event that the Commonwealth pursuant to a plan or a distribution in accordance with section 726 of the Bankruptcy Code recovered less from the bankruptcy estates than the amount of the loan, the Settlement Agreement provided that the Commonwealth would not be obligated to pay over to U.S. Fire any sums beyond the amounts recovered. The objective of the Settlement Agreement was expressly set forth by the Commonwealth and U.S. Fire:

> The objective of this agreement is to preserve the Commonwealth's priority claim for taxes under 11 U.S.C. § 507 and § 1129 for the benefit of U.S. Fire, while at the same time enabling U.S. Fire to discharge its obligation to make prompt payment of what appears to be a valid claim on the Bonds as required by

**1.** Both the Trustees and the Commonwealth in their memoranda have referred to the "Massachusetts Department of Revenue's Response to Interrogatories and Request for Production of Documents." Although the Response was not moved into evidence, the Court has reviewed the pertinent documents and answers cited by the parties and where appropriate has supplemented the facts set forth in the memoranda with reference to the contents of the Response referred to by the parties.

**2.** The recitals in the Settlement Agreement indicate that Beverages was or could be liable for

liquor excise taxes in the principal amount of $176,007.96 and N.P. was or could be liable for liquor excise taxes in the principal amount of $8,630.62. Moreover, Eileen Casey, a DOR employee, in answers to interrogatories, indicated that the principal amount of the tax due, exclusive of interest and penalties, was $184,638.58. Accordingly, the Court is puzzled by the Commonwealth's assertion on page 8, footnote 6 of its memorandum that that amount was less than the principal amount of the claims under the bonds.

Massachusetts law. The parties disclaim any liability on the part of the Commonwealth (1) to repay the Loan in an amount in excess of the amounts recovered on the Commonwealth's claims pursuant to a Plan or a Distribution and (2) to defend the validity of this Settlement Agreement in the Proceedings. In the event that the Commonwealth's claims are disallowed in full by the Bankruptcy Court due to the making of the Loan and the execution of this Settlement Agreement, or for any other reason, the Commonwealth shall have no obligation to make any payment to U.S. Fire on account of the Loan.

In accordance with the terms of the Settlement Agreement, U.S. Fire delivered two checks to the Commonwealth. With respect to the application of the two checks, John Giamattei, Principal Tax Examiner in the Bankruptcy Unit, in answers to interrogatories, indicated that he informally applied the checks to two of the four proofs of claim filed by the Commonwealth in the amounts of $177,849.85 and $1,881.45. He then forwarded the checks to Eileen Casey, a Tax Examiner IV in the DOR's Determinations Bureau, Excise Unit, for formal application to the outstanding tax liabilities. Ms. Casey, in turn, delivered the checks to the Revenue Accounting Bureau. Alan Golobski, Chief of the Revenue Accounting Bureau, in answers to interrogatories, indicated that in the absence of special instructions concerning application of the $184,638.58, that amount was applied to taxes, penalties and interest in no particular order at the discretion of the cashier who received the checks. Thus, ten separate cashiers' coupons were detached from bills on May 6, 1985 to indicate that $184,638.58 was paid on the debtors' tax liabilities, and this was reflected on the relevant ledger cards—the official record maintained by the Department of Revenue of unpaid alcoholic beverage excise tax bills and payments against them. However, from the documents attached to the Commonwealth's response to interrogatories, it is clear that unpaid bills remain, totalling $38,425.13.

## DISCUSSION

The Trustees object to the Commonwealth's claims on several grounds. They maintain that the Commonwealth is not owed anything and has no economic interest in its claims since U.S. Fire paid the Commonwealth in full. From the Trustees' point of view, U.S. Fire is attempting to shift onto the other unsecured creditors the loss it experienced as a surety of Beverages and N.P. The Trustees urge the Court to look to the real substance of the transaction involving the Settlement Agreement and to properly characterize U.S. Fire's voluntary "loan" as an involuntary payment required by law. *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939).

The Trustees' argument is flawed in one respect. U.S. Fire only paid the Commonwealth the principal amount of the excise taxes owed by Beverages and N.P. Therefore, the Commonwealth possibly could assert an additional claim in the amount of $38,425.13 for interest and penalties as reflected in Exhibit 41—"Summary of Form AB—7's, Ledger Cards and Cashier's Coupons" attached to the Commonwealth's answers to interrogatories or at least $610.49 —the difference between the amount paid by U.S. Fire and the total amount of the Commonwealth's proofs of claim. However, the Trustees are correct in noting that the Commonwealth is not taking any steps to prosecute its claims. Indeed, throughout these proceedings, counsel to U.S. Fire has prepared and submitted pleadings in the name of the Commonwealth, and counsel to the Commissioner has appeared more as an observer than a participant in these proceedings. In short, U.S. Fire, in the name of the Commonwealth, is prosecuting a claim for the amount it "loaned" the Commonwealth, and the Commonwealth, by its inaction, may have waived any claims for an amount in excess of $184,638.58.

U.S. Fire maintains that its "loan" to the Commonwealth does not constitute payment of the Commonwealth's claim. Citing *Crocker v. New England Power Co.*, 348 Mass. 159, 202 N.E.2d 793 (1964) and *Na-*

*tional Shawmut Bank of Boston v. Johnson,* 317 Mass. 485, 58 N.E.2d 849 (1945), it asserts that the loan is valid and enforceable and does not constitute payment of the underlying debt.

Putting aside the issue of whether U.S. Fire's "loan" to the Commonwealth is enforceable as such, the Trustees next argue that when U.S. Fire paid the obligations of Beverages and N.P. to the Commonwealth it became subrogated to the Commonwealth's claim against the debtors. Although subrogated to the Commonwealth, the Trustees' maintain that section 507(d) of the Bankruptcy Code operates to deny priority status to U.S. Fire as a subrogee of the Commonwealth's section 507(a)(7) claims.

■ Section 507(d) provides:
An entity that is subrogated to the rights of a holder of a claim of a kind specified in subsection (a)(3), (a)(4), (a)(5), or (a)(6) of this section is not subrogated to the right of the holder of such claim to priority under such subsection.
11 U.S.C. § 507(d). According to Collier, section 507(d) bars priority status to subrogated claims which would otherwise receive priority and extends to claims which receive "tax priority under section 507(a)(7) (erroneously referred to in the statute as 507(a)(6)." 3 *Collier on Bankruptcy* ¶ 507.07 (15th ed. 1988).

The Bankruptcy Amendments and Federal Judgeship Act of 1984 was enacted on July 10, 1984 and became effective 90 days thereafter. It made a substantive change to section 507 of the Bankruptcy Code through the creation of a new fifth priority for unsecured claims of grain or fish producers to the extent of $2,000 where a storage facility files bankruptcy. Consequently, the former fifth and sixth priorities became sixth and seventh priorities. However, section 507(d) remained unchanged. Collier goes on to state that:
Congress, in enacting the 1984 Amendments failed to correct the cross-references to section 507(a) that appear in other Code provisions to account for the 1984 Amendments; the Bankruptcy Judges, United States Trustees, and

Family Farmer Bankruptcy Act of 1986 corrected a number of these cross-references to reflect the redesignation. It is impossible to discern whether the absence of any reference in section 507(d) to the fifth priority for grain producers and fishermen, added in 1984, was part of this negligence or was deliberate. The Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986 made no amendments to section 507(d) and, therefore, did not address this problem.
*Id.* (footnotes omitted). Courts that have addressed the problem have concluded, like Collier, that subsection (a)(6) should read (a)(7). *See e.g. In re Henzler Manufacturing Corp.,* 89 B.R. 655, 657 (Bankr.N.D. Ohio 1988); *In re Trasks' Charolais,* 84 B.R. 646, 652 n. 9 (Bankr.D.S.D.1988); *In re Spruill,* 83 B.R. 359, 369 n. 1 (Bankr.E. D.N.C.1988); *In re Tentex Marine, Inc.,* 83 B.R. 530, 534 (Bankr.W.D., Tenn.1988); *In re Gaumer,* 83 B.R. 3, 4 (Bankr.S.D.Ohio 1988); *In re All Star Sports, Inc.,* 78 B.R. 281, 284–85 (Bankr.D.Nev.1987); *In re Barefoot Sports, Inc.* 61 B.R. 546, 548 n. 2 (Bankr.W.D.Wis.1986).

Prior to the 1984 Amendments, courts frequently confronted statutory interpretation issues with respect to the use of the word subrogated in section 507(d), since the terms "assignment" and "subrogation" are sometimes used synonymously by courts as well as the public. *See e.g. In re Missionary Baptist Foundation of America, Inc.,* 667 F.2d 1244 (5th Cir.1982); *In re Walsey,* 29 B.R. 328 (Bankr.N.D.Ga.1983); *In re Woerner,* 19 B.R. 708 (Bankr.D.Kansas 1982). For example, in *In re Missionary Baptist Foundation of America, Inc.,* 667 F.2d 1244 (5th Cir.1982), the Court of Appeals held that a store that had cashed payroll checks for the debtor's employees was an assignee of the employees' claims and thus entitled to assert the employees' wage priority. The court construed the term subrogated in section 507(d) restrictively to refer only to "sureties, co-debtors, or other entities which are liable with the debtor or which have secured a claim of a

creditor." *Id.* at 1245. The court noted that:

Section 507(d) is a rather curious provision. It was not included in the House version of the bill that became the 1978 Act (H.R. 8200, 95th Cong., 1st Sess.), nor was it included in the substitute bill passed by the Senate (S. 2266, 95th Cong., 2d Sess.). After the Senate sent its version of the bill back to the House, the floor managers from both Houses met and agreed upon a compromise bill, which was enacted into law. § 507(d) was included in the compromise bill. The floor managers who drafted this bill offered no explanation for the addition of § 507(d), and commentators have been unable to identify any policy reasons that might have prompted the inclusion of this provision.

*Id.* In reaching its decision to exclude assignees from the scope of section 507(d), which denies by its terms priority only to subrogees, the court relied upon *In re Stultz Brothers,* 226 F. 989 (S.D.N.Y.1915) and the presumption used in statutory interpretation that "repeals of judicial constructions of legislation are usually required to be clear and manifest." 667 F.2d at 1246.

■ In view of the overwhelming statutory construction of section 507(d) to read (a)(7) instead of (a)(6), the absence of any explanation for the addition of section 507(d), the absence of any reasons for substantive change to it after the 1984 Amendments, and the above quoted presumption used in statutory construction, the Court is inclined to defer to the weight of authority despite the lack of ambiguity in the present, post–1984 language of the Code and the pre–1978 bankruptcy law which permitted parties subrogated to tax claims to retain the priority of those claims. The Court agrees with the view expressed by Bankruptcy Judge Barbara J. Sellers that:

The Court finds no indication in the legislative history that any substantive change was intended for § 507(d).... The existing policy against subrogation of certain claimant's status would not have changed without indication by Con-

gress that substantive change was intended.

*In re Gaumer,* 83 B.R. 3, 4 (Bankr.S.D. Ohio 1988). Thus, the issue the Court must decide for purposes of this bankruptcy proceedings only, is whether the *substance* of the Settlement Agreement was payment by U.S. Fire of its obligations under the bonds, with the loan *form* of the transaction being merely a way to enable U.S. Fire to obtain the Commonwealth's priority position. However, the actual, validity and enforceability of the agreement between U.S. Fire and the Commonwealth is not an issue that must be addressed by the Court. Parenthetically, the Court notes that the cases relied upon by the Commonwealth to support its position that the Settlement Agreement is valid, namely *Crocker v. New England Power Co.,* 348 Mass. 159, 202 N.E.2d 793 (1964) and *National Shawmut Bank of Boston v. Johnson,* 317 Mass. 485, 58 N.E.2d 849 (1945), are nonbankruptcy cases that pre-date the 1984 Amendments to the Bankruptcy Code.

Despite the use of the term "loan" in the Settlement Agreement, the Court is unconvinced that an actual loan was intended since the Commonwealth disclaimed any obligation to make any payment to U.S. Fire on account of the loan. The Court notes that the specific objective of the Settlement Agreement simply was to preserve the Commonwealth's priority claim for the benefit of U.S. Fire while enabling U.S. Fire "to discharge its obligation to make prompt payment of what appears to be a valid claim on the Bonds as required by Massachusetts Law." Moreover, the Commonwealth treated the checks it received from U.S. Fire as payment of tax liabilities of Beverages and N.P. Additionally, the Commonwealth of Massachusetts, Department of Revenue does not appear to have any statutory authority to borrow money.

■ Acting in the name of the Commonwealth, U.S. Fire, on March 31, 1988, filed a pleading captioned "Amendments to Commonwealth's Proofs of Claim" in which it stated: "[if] the Court should determine that the loan constitutes payment of any portion of the debtors' liability to the Com-

monwealth, U.S. Fire continues to assert as subrogee the Commonwealth's claims, including the priority of those claims." The Commonwealth disclaimed any interest in the Amendments and accompanying Motion to Amend. Indeed, it stated that "no agency authority exists which would authorize U.S. Fire to act in the name of the Commonwealth" with respect to the amendments to the proofs of claim. However, the Court allowed the Motion to Amend. Nevertheless, it is clear to the court that if U.S. Fire is subrogated to the Commonwealth it is not necessary for U.S. Fire to have submitted a proof of claim in its own name. *See* 11 U.S.C. §§ 502(e)(1)(C), 509(a), (b)(1)(A); Bankruptcy Rules 3002, 3005; and *In re Barefoot Sports, Inc.*, 61 B.R. 546, 548 (Bankr.W.D.Wis.1986) ("It is clear from the statutes that a party who has not filed his own claim in a bankruptcy case may nevertheless be subrogated to the rights of a claimant under that claimant's properly filed claim.").

In *In re Trasks' Charolais*, the court stated:

One who claims to be subrogated to the rights of a creditor must satisfy five criteria:

1) Payment must have been made by the subrogee to protect his own interest.

2) The subrogee must not have acted as a volunteer.

3) The debt paid must be one for which the subrogee was not primarily liable.

4) The entire debt must have been paid.

5) Subrogation must not work any injustice to the rights of others.

84 B.R. 646, 648 (Bankr.D.S.D.1988) (citations omitted). Based upon the Court's analysis of the Settlement Agreement, it is clear that U.S. Fire paid the Commonwealth to protect its own interest and was not acting as a volunteer. Moreover, the Debtors, not U.S. Fire, were primarily liable for payment of excise taxes. In view of the fact that the Court is convinced that section 507(d) contains an erroneous reference to section 507(a)(6) instead of (a)(7), U.S. Fire does not accede to the Common-

wealth's priority position so that subrogation does not work a hardship on the unsecured creditors. Thus, the only question remaining is whether the entire debt was paid. As the Court has noted, the possibility exists that the Commonwealth could at some time claim sums in excess of $184,-638.58. However, to date the Commonwealth acting in its own behalf has not amended its proofs of claim which at present exceed the amount paid by U.S. Fire by $610.49—a *de minimis* amount. Accordingly, the Court holds that U.S. Fire is subrogated to the Commonwealth with respect to the Commonwealth's claim in the amount of $184,638.58, but not as to the Commonwealth's priority status. This determination is consistent with the fact that the Commonwealth has permitted U.S. Fire to act as its agent, and has not pressed its claim for interest and penalties.

■ In its memorandum, the Trustees argue that the Commonwealth's claim (in reality U.S. Fire's claim as a subrogee of the Commonwealth) should be equitably subordinated to the claims of the unsecured creditors. In view of the difficult issues of law involved in this case, the Court cannot find the bad faith or inequitable conduct on the part of U.S. Fire necessary to warrant equitable subordination. *See generally In re Beverages International Ltd.*, 50 B.R. 273, 281 (Bankr.D. Mass.1985). Given the absence of an affidavit contradicting that submitted by the Commonwealth, the Court accepts the affidavit of Robert R. Marcus with respect to events leading up to the Settlement Agreement and the good faith of the parties.

In view of the foregoing, the memoranda and arguments of counsel, the Court hereby allows the claim of the Commonwealth as subrogor of U.S. Fire in the amount of $184,638.58, without prejudice to the rights of the Commonwealth to amend its proofs of claim with respect to interest and penalties and without prejudice to the rights of the Trustees to object to any such amendment.

So ordered.